Good morning, Your Honors. May it please the Court, my name is Daniel Saunders. I represent Defendant Appellant Russell Pike, and I would ask to reserve three minutes of my time for rebuttal. Your Honors, I was in AUSA for 14 years, and during that time I saw a lot of trials and I saw a very wide range of performance of counsel. I don't think I'm exaggerating when I say my reaction reading the transcript of this trial, when I came in after the trial, was that this trial was a travesty. In fact, if we're prepared to say that this trial involved effective assistance of counsel, then I think that's pretty much tantamount to saying that all a lawyer needs to do to satisfy the Sixth Amendment is show up. He doesn't have to prepare, he doesn't have to interview witnesses, he doesn't have to know the facts or know the law or know the procedure. He just has to come in, ask a few questions, and if his client ends up getting sent to prison for 52 months, that's okay because the government will just say, well, it was all acceptable trial strategy. I think there are two important things that I would ask this Court to realize when evaluating this trial and specifically the performance of defense counsel. First is that this was a complicated case. This case was investigated for over two years. It was pending for three. It involved a number of complex transactions involving this company, Zions. It involved a number of hostile takeovers and takeover attempts. There were settlement agreements that sought to recharacterize some of these transactions. And there were potentially very complex issues regarding the tax treatment of those transactions. In fact, they were so complex that two lawyers, Peter Renato and Michael Reynolds, who, in addition to being a lawyer, was an IRS criminal investigation special counsel for 12 years, both testified that they couldn't determine, based on the records that were available after the new people who had taken over at Zions shredded most of the documents, they couldn't determine what the tax treatment was in order to be able to counsel Mr. Pike and file a correct tax return. The second, in addition to it being a complicated case, this was a highly defensible case. There was no confession. There was no testimony by an accountant like you sometimes have in evasion cases of I told the defendant that this was what he needed to do. There were no multiple counts. There was no pattern. The case rose and fell on this single count with respect to the 2006 return. And of all of the affirmative acts of evasion that the government charged, the Court found one. And we've shown under the Sansoni case that even that one, under controlling Supreme Court authority, can't support a tax evasion conviction as a matter of law. So we have this legally complex and highly defensible case, and into it, 11 days before trial, comes a junior associate who was not hired by the defendant, who has never appeared in Federal court, who has never learned anything about Federal tax law. And it sounds like your client has a beef with the attorney that he hired. That's And the excuse was that he had to be someplace else for a defense. Was there a deposition on the day of the day of trial? That's correct, Your Honor. He had to be up in Northern California. Sounds like a terribly good excuse, given how complex this case was, and that your client would only learn 11 days before trial, that his principal counsel had abandoned him? And that's correct, Your Honor. And co-counsel John Lusk, who was the one who was so ill and actually in a coma weeks before trial in the hospital several times, said that he, too, was shocked when he came out of the hospital and out of his rest shortly before trial. Do we have an affidavit from the principal counsel in this case? We do not, Your Honor. And I submit that that was something that the government certainly could have obtained and could have done. And that's typically how But you didn't seek one. I believe there was one sought, and he did not, he would not give one, Your Honor. Okay. How about from Mr. Leak? I'm sorry. Mr. Leak, Mr. Leik, I believe, was the counsel that we sought one from. How about his supervising attorney? No. I'm sorry. From Mr. Skrow, there was not a declaration. Okay. There was a declaration from Mr. Lusk, from Mr. Pike, of course, and from three other witnesses, including people who witnessed this hallway conversation. Do you know who Mr. Leik's background was? I'm sorry, my client's background, Your Honor? No, Mr. Leik. He had been, I believe, a county federal, a county public defender, Your Honor. So he'd been a public defender. Yes. So not insignificant. No. For, since you were in AUSA for 14 years, you know that they're formidable. Absolutely, Your Honor. But there's significant differences between State procedure and the Federal courts, as the Court notes. How many years has he been out of law school? Excuse me? How many years has he been out of law school? Have I been? No. He. He been. I'm sorry, Your Honor. I didn't want to answer that question. I'm sorry. I didn't want to get personal with you. I appreciate that. I didn't want to ask you about Mr. Leik. I don't know how many years he had been out. I know he was junior with Mr. Skrow's firm, and Mr. Skrow was the one who, by uncontested evidence, Mr. Pike had hired, based on his experience, based on his familiarity. And to walk in as a county public defender into a complex Federal tax trial with the promise that Mr. Leik made to basically become an expert in tax law over the weekend, that's just preposterous, given some of the issues here and given how complex they were, that, again, Mr. Renato and Mr. Reynolds, both of whom were tax lawyers, testified about how complex the trial was. Mr. Pike was obviously very unhappy with this situation. Did he consider firing his attorneys? What he did is he asked them to tell the Court that they were not ready and ask for more time, and they refused to do that. And that's in the record. They determined that based on the number of continuances that the Court had already given, they did not want to take a chance of incurring the Court's displeasure by asking for yet another continuance. But he did ask them to put on the record that they were not ready and to delay so that he could have Mr. Skrow represent him. But I can see why they wouldn't ask the Court that if the reason was that the lead attorney was just taking a deposition somewhere else. I think that could have been a very good reason. Perhaps that's just another example of the ineffective assistance, that they didn't make that request, because I frankly can't imagine Judge Mahan, even as displeased as he was with how long the case had been pending, not granting a continuance if you have one counsel who's just gotten out of the hospital where he's been in a coma and another counsel who has a conflict that results in him trying to turn this case over to somebody who doesn't know the case. It's just surprising that as smart as Mr. Pike was, as experienced a businessman, that it didn't dawn on him until 11 days before trial that his counsel had abandoned him. Well, that's when it happened, Your Honor. That's when the counsel did abandon him. He had been trying to reach Mr. Lust. He didn't know Mr. Lust was hospitalized. He had been trying to reach Mr. Skrow. He didn't get calls back. But it was only 11 days before trial on, I believe, March 15th when he was informed by Mr. Lyke that Mr. Skrow was not going to be at trial and Mr. Lyke was going to do it in his place. That was 11 days before trial when all of that happened. And I think to focus on the ineffective assistance here and really point out why it was so damaging to have Mr. Lyke, who didn't know tax law, represent Mr. Pike in this case, in this criminal case where he's now sitting in prison for more than four years, there are two key arguments, key arguments that any lawyer who is familiar with Federal tax law would have known and that Mr. Lyke completely missed, and they are both arguments that have a reasonable probability of resulting in Mr. Pike's acquittal on the one and only count in this indictment. The first is the issue of what's called the cheap defense, and that is the good faith belief, based, among other things, on the advice of counsel, that he is complying with the law, then even if that subjective belief is objectively unreasonable, he cannot be found guilty of tax evasion. Because the element of willfulness is he knew he owed taxes, though, and hadn't paid them. Well, the testimony was that Renato, his lawyer, his tax advisor on that 2006 return, and his only tax advisor on that 2006 return, despite the judge's confusion of the other testimony, had told him his income for 2006, depending on how these classifications were classified in the audit, could be anywhere from zero to $8 million. Now, of course, if it's zero, he's not going to owe tax on that. If it's anything more than that, he will. But it was total guesswork at that point as to what that would be. And so Renato, who was not some outside accountant coming in at the last minute, but was the person who had drafted the transactions, the Moscatia transaction at issue, he had been deeply involved. He knew these facts. He knew the money had come in in 2006. He knew about the agreements. He knew what was going on, and he was the one, having been directly involved from the beginning, who's telling Mr. Pike in April, don't file a return. We need to wait until this audit is done, because I have no idea what your income is going to turn out to be. And, key point, then tells him again in October the same thing. And that's clear in Mr. Renato's declaration. It's clear that he told Mr. Leik about this beforehand, and it's equally clear that Mr. Leik did not understand or appreciate the importance of that testimony. He barely made a passing reference in his opening statement to this advice of counsel. It was almost a throwaway. And then he didn't ask Peter Renato the key question of did you advise him or what did you advise him in October 2007 regarding his 2006 tax return. And even after people pointed out to him, you didn't ask this question. It's important. You need to ask it. Mr. Leik's response was, no, I already asked it. I'm not going to ask it again. That will just accept the charge. Alito What would Renato have told him that would have relieved him of tax liability for the 2006 transaction? It wouldn't have relieved him of tax liability. It would have, what Renato told him, this is in Renato's declaration, what he told him is that, and Renato may have been wrong in his assessment of this, but Renato believed that it was more risky to file a false return than to file a delayed return. And he said, based on the fact that the audit hasn't been completed at this point and there is so much uncertainty surrounding these transactions and whether they're income to you or income to the company or how much you owe or how much they owe you, it's better to wait, let the audit be finished. We thought it would be done by now. It still isn't finished. Wait for that. Then you can file a delayed return. You can pay any penalties, and those penalties can be abated for good cause anyway. Whereas if you file something now, you'll just be picking numbers out of the air and putting them down on a return, and that could be potentially worse. That's a felony. Now, that was Renato's call. That was his judgment as an experienced tax professional. Maybe Renato — How experienced was Mr. Renato? He had been a tax lawyer for seven years. He had prepared, I believe, hundreds of returns was the testimony, individual and corporate. He had been the general counsel for Zions and therefore did not advise Mr. Pike with respect to the prior year, 2005. But by the time the 2006 return was coming due in early 2007, Mr. Renato was no longer general counsel, and he therefore testified he felt comfortable advising Mr. Pike. And he did with respect to the 2006 return that was due in 2007. So we have this key question that Mr. Leick doesn't realize the significance of, never asks, it never gets in the record. And we know it's prejudicial because, sure enough, when it comes time for Judge Mahan's verdict, when he pronounces Russell Pike guilty after a bench trial, he specifically says, there was no testimony from anybody who said I advised him in October 2007 not to file a return. Now, why would the judge say that if that testimony was insignificant or would have been unimportant to the judge? Of course it was important because it was – it goes directly to the heart of the cheek defense and could have provided a complete defense to the element of willfulness and therefore to tax evasion. The second key argument that Mr. Leick missed, and again, this is something that any tax lawyer would know. There are two key Supreme Court cases that deal with the issue of affirmative acts in Spies tax evasion under Section 7201. There's the Spies case, after which the charge is named, and there's the Sansoni case. And Sansoni followed Spies by 22 years. And what Sansoni says in distinguishing the felony tax evasion from the lesser misdemeanor of filing a false tax return under Section 7207 is that in order to have the felony, you have to have not just an affirmative act, which you have to have under the misdemeanor as well, but that affirmative act has to have, and they use the words, the requisite effect, the requisite effect on the stated tax liability. That affirmative act, in order to constitute felony tax evasion, has to have an effect on the tax liability. And the one act that Judge Mahan found in this case was this purported request to, from Russell Pike to Kareem Mosquettea to postdate the transaction for their sale of stock, which was a $5 million transaction. Now, the government never explained below and has not explained in its brief here how that postdating of that document could have possibly affected Russell Pike's tax liability. To the contrary, the government conceded on page 18 of their appellee's brief, quote, because he, meaning Pike, actually received the $5 million in 2006, the IRS would treat the money as income to him in 2006, even if the stock purchase agreement stated that the transaction occurred in 2007. And the government is absolutely correct on that. For tax purposes, the date on the document is completely irrelevant. What matters is when the money arrived in the account, when the money was paid.  I mean, it's like, sure, that just determines some platonic tax liability. But, counsel, if I understand your argument right, it's like saying if I fail to pay taxes for the next 5 years with no intention of paying them, it doesn't affect the fact of my tax liability. My tax liability is still the same. That's your argument.  And I don't see it. But here's the key, Judge Breyer, and that is if you fail to pay taxes for the next 5 years, you're guilty of the misdemeanor of failing to file a tax return. You're not guilty of tax evasion, which requires that further step under Spies and Sansoni of an affirmative act to evade or defeat tax. And that has to be something more. It's clear under Supreme Court law than simply not filing a return or paying taxes. Right. And the affirmative act here was trying to get a postdated document so that his tax liability wouldn't arise until 2007. But that wouldn't and couldn't possibly have been the result, because regardless of the date on the document, the tax liability arises not when the document is dated, but when the money is in the account. That's just specious. If he's got a credible argument to go back to the IRS and say, you can't charge me for 2006, but the transaction was actually in 2007. Here's the document that shows it. But the money is in the account November 2, 2006. Right. The IRS is going to come after him for some kind of fraud, but he's sure going to make the attempt. That's why he went to Miskatia, is to try and put all of this off for at least another year. It would have bought him time. There were other things going on with science. There were other complexities here that he thought he might get away with. He was gambling proceeds right and left, might have tried to get it back at the casinos for all we know. But trying to postdate a document and then with the potential of coming to the IRS and saying the transaction is in 2007, not in 2006, I understand platonically that there's an obligation in the sky someplace because he actually received the money in 2006. I'm not sure what the court means by platonically, but in this the point that I'm trying to focus on is that the tax is going to be determined. The tax is going to be calculated based on when the money was received. In all the other cases that we look at involving 7201, there is something that is done that is going to affect the IRS. But your argument is he wouldn't have gotten away with what he was trying to get away with. Yeah. But it doesn't change the fact that he was trying to get away with something when he goes to the Mesquitea and asks him to postdate the documents. Let me – I do want to reserve a little time for rebuttal, if I could make one final point before I go. Actually, two minutes over. Am I over now? You're over your time now. Well, then I will sit down and hope the Court will give me a break. I will allow you two minutes for rebuttal. Thank you, Your Honor. May it please the Court, Alyssa Hart-Mahan for the United States. And I just want to make clear, no relation to the district judge in this case. The evidence introduced at trial overwhelmingly established that the defendant received $7.9 million in income in 2006 from his – from the sale of Zions stock that he personally owned. That $7.9 million went to his personal accounts, was used for his own benefit. He attempted to falsify documents to conceal the fact that he received that income in 2006. And – What benefit would he have gotten from trying to postdate these documents? Just time value of money? Presumably time value of money or, you know, he might anticipate that there would be, you know, offsetting – you know, offsetting deductions in the future that could – you know, that he could use to somehow reduce his tax liability. Which there were, which it turns out there may have been with the bankruptcy. You're right. There very may well have been. But under the precedence of this Court and the Supreme Court, it's clear that he was And that that affirmative act constitutes an affirmative act of evasion, notwithstanding whether it would have succeeded in misleading the IRS about when he actually received the money. And Sansone, which the defendant attempts to rely upon, is simply an apposite here that's dealing with a false return. And the situation there was if you had a false return that did not actually understate the tax liability. And so Sansone is dealing with the stated tax liability on a return. Here, there was no return filed, but you had an affirmative act of evasion to conceal the fact that he received income in the tax year at issue. And that's a classic case of spees evasion. So that affirmative act of evasion was legally sufficient. So again, the defendant received this income in 2006. He knew that he had a tax liability, did not file a return, and committed this affirmative act of evasion, thereby meeting all of the elements of tax evasion. As far as the as far as his claims of ineffective assistance of counsel, the record makes clear that even if Peter Renato had testified that he advised the defendant not to file a return, the outcome of the trial would have been the same. He still would have been convicted of tax evasion. And that's true for a couple of important reasons. First, as the district court recognized, the defendant was receiving tax advice from multiple sources in 2007. Renato himself testified that he had referred the defendant to Bob Grossman in 2006 and made clear that the defendant's relationship with Bob Grossman continued into 2007, that the defendant was consulting with Bob Grossman, the tax attorney Bob Grossman, in the summer and fall of 2007. So again, it's not clear. In order to establish a reliance defense, the fact that the defendant was consulting other attorneys other than Renato, that significantly undermines any reliance defense. Another key part of a reliance defense is that the defendant must show that there was full disclosure to the professional upon whom he was claiming to rely. And Renato's testimony at trial makes clear that the defendant did not fully disclose to him what he did with that $5 million or his use specifically of the $900,000 that he kept for his own purposes. And Renato testified, I don't know why he kept that money, I don't know what he did with that money. Now, that was a pretty important piece of information for Renato to know in order to be able to, you know, give him advice that he could claim to rely upon. The defendant also never claims that Renato advised him to try to or Renato or any other tax attorney advised him to try to alter the date of the stock purchase agreement with Kareem Moskatiya, which occurred in 2006. So he has no reliance of counsel defense for that affirmative act of evasion. And I would also point out that failure to file a return is not an element of tax evasion as recognized by the Supreme Court in Spies. The district court properly held that the defendant had not established prejudice from his trial counsel's alleged errors in light of the fact, again, that he knew that he had a tax liability, that he had this $8 million in income in 2006, and that he committed the affirmative act of evasion when he attempted to falsify documents. The district court also properly calculated the amount of tax loss at sentencing. Again, in order to prove tax evasion, the government had to prove a tax deficiency. And so that was a central issue at trial, was the amount of tax that was due and owing for a defendant in 2006. The district court in its verdict specifically found that the Moskatiya transaction was income to defendant, was taxable to defendant, found that beyond a reasonable doubt as sitting as the finder of fact. And it was appropriate for him to rely upon that finding at sentencing. I would also note that if the district court had adopted defendant's argument that the tax loss was in fact zero, that would have directly conflicted with the verdict in this case, which required proof of a tax deficiency. If the Court has no further questions, we ask that the Court affirm the district court's judgment. Roberts. Thank you. Mr. Saunders, I'll give you two minutes. Thank you, Your Honor. With respect to the two points that counsel raised, with respect to the outcome being the same if Renato had testified, first of all, it is not correct that the record reflects that Mr. Pike was receiving tax advice from multiple sources. We've addressed this in our reply brief. The evidence, the clear evidence in the record is that Bob Grossman was involved with the 2005 return. In 2006, Renato testified over and over again that he was the only person counseling Mr. Pike with respect to the 2006 return in 2007. And contrary to counsel's representation that the two points were the same, it is not correct that the record reflects that Mr. Pike was receiving tax advice from multiple sources. And he referred Pike to Grossman in connection with the 2005 return because he had a conflict at that time since he was general counsel. And as far as this meeting that occurred that I believe counsel said was in the summer or fall of 2007, the testimony was that there may have been a meeting sometime in 2007, but Renato is not sure if either he or Pike attended. So there was no evidence of a meeting with Grossman. And to the extent that there was, the testimony was clear that it related to trying to get that 2005 return filed that they were still working on. So Renato's testimony and his advice with the 2006 return was key. And Judge Mann's finding that nobody testified about advising him in October not to file a return, it's Renato and only Renato who could have and would have provided that testimony. With respect to the full disclosure issue, again, what Mr. Pike did with the $900,000 is not germane to the issue of whether there was enough information available to file an accurate return at that point. And that's what Mr. Renato advised Mr. Pike there wasn't, and that's why he was advised to wait. And we have heard the argument earlier with respect to Father Dan and the issue of what he would have testified to. Here we know what Was Father Dan involved in this case, too? We know, we know what Renato would have testified to. We have it in a declaration. More importantly, Mr. Like knew what Renato would testify to. It's not that he didn't look at the file he met with Renato for, albeit, 15 minutes, but Renato told him what he would testify to and what questions to ask to bring that out. And moreover, you had the defendant himself during the recess pointing out to Mr. Like, you didn't ask this question. You need to ask this. It's important. And Mr. Like then saying, no, I'm not going to do that. I did it already. Now, if that's, again, not ineffective assistance going to the core of really what the court relied on in its verdict, then I think the Sixth Amendment has lost a lot of its weight. If I may have just 10 seconds, I wanted to point the court to one case that I found last night. I've pointed it out to counsel. I didn't have time to file a letter on it, but it dealt with the standard of proof on the sentencing issue. And it's United States v. Stargell, S-T-A-R-G-E-L-L. It's What you should do is get a tear sheet from the deputy clerk and put it there and a copy will be provided to counsel and the deputy clerk will provide us with the citation. Very good. Thank you, Your Honor. We thank both counsel for the argument. It was well briefed and well argued today, and we do appreciate it. And with that, the court has completed its docket and the court is adjourned. All right. This court for this session is now adjourned. It's not safe. All sorts of other things are going on.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you very much. It's all right. It's all right. It's all right. It's all right. Yes, I'm sorry. I'm sorry. Well, no one. OK. She's, you know, Roscoe will know that. Thanks for being out there in my organization.  Thank you so much. You know, um, did, did you guys do the tour of this hospital, what happened? We had a team of, a team of, a team of people who were in a care room. Oh. They were just, personal, they were in a call-in care room. The only time they let you take pictures was, um, one of those tours for the public. That's the only time. Okay. And, like, the Marshall guys over here, uh, did it. Okay. Actually, they've been willing to take cameras from people, from those boys, too. And, some people would tell me, hey, you guys are here, and we'll get it done. Just. Thank you for that. That's a pleasure to do. Okay. Have a nice afternoon. Alright. Thanks. Thanks. Thank you. The numbers, again, uh, again, uh, it's just, you know, I've been teaching a lot of people, and asking questions, and getting answers, and trying to answer some of them, and getting answers out of them. So, it's just, so, it's like, um, probably, all the time, you know, all the time, you've got to, you've got to, you've got to, you've got to, you've got to, you've got to, you've got to, you've got to, you've got to, you've got
judges: Beistline, Schroeder, Bybee